IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cr-466-TFM-WC |
| | ) | |
| RAYMOND DAVID JACQUES, III | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

Defendant Raymond David Jacques, III ("Jacques" or "Defendant"), is charged with violations of 21 U.S.C. § 841(a)(1), possession with intent to distribute methamphetamine, and 18 U.S.C. § 924(c)(1)(A), possession of a firearm in furtherance of a controlled substance crime. Doc. 1. Evidence of those alleged crimes was seized from Defendant's vehicle as part of a controlled delivery involving a confidential informant ("CI"). Defendant filed a Motion to Suppress (Doc. 18), which is currently pending before the Court. In the motion, Defendant argues that his Fourth Amendment rights were violated because the police did not have reasonable suspicion or probable cause to stop or arrest him and that the evidence retrieved from his vehicle should be suppressed. Doc. 18 at 1.

## I.     FINDINGS OF FACT[1]

On February 7, 2018, Detective Robert Hubbard ("Detective Hubbard") conducted a search warrant at the residence of Erin Hurst ("Hurst") located on Texas Court in Montgomery, Alabama. Supp. Hr'g. Tr. (Doc. 37) at 4. The search warrant followed a

---

[1] The court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

controlled buy in which Hurst had sold methamphetamine. *Id.* at 58.   While being interviewed by the police after her arrest, Hurst agreed to provide the names of several people from whom she was purchasing methamphetamine. *Id.* at 4.   Hurst did not sign a contract setting forth her duties in acting as a confidential informant, and Detective Hubbard had not previously worked with her. *Id.* at 16.

One of the individuals identified by Hurst was the defendant in this case, Raymond Jacques, whom she calls "Bubba." *Id.* at 6–7.   Ms. Hurst told the police that Jacques lived on Forest Hills Drive and drove a white Nissan Titan truck. *Id.* at 7.   Detective Hubbard used the computer systems available to the police department to verify Jacques' address and vehicle information given to him by Hurst. *Id.* at 7–8.   Hurst also identified Jacques from a photo shown to her by Hubbard. *Id.* at 8.    Upon verifying Jacques' residence address, Hubbard sent officers to Jacques' home to begin surveillance. *Id.* at 10.

Hurst indicated to Detective Hubbard that she could arrange to buy half an ounce of methamphetamine from Jacques.  *Id*.  The interview between Detective Hubbard and Hurst was videotaped.  The Government produced copies of the videotapes of the interview to the undersigned following the suppression hearing.  The videos show that Hurst spoke to Jacques on the phone and that they texted over a span of almost four hours while Hurst was in custody at the police department.[2]   Below is a summary of the relevant activity from the video tapes.

---

[2] Defendant does not argue that he was not the person on the phone with Hurst or that he has was not, in fact, communicating with Hurst by text on that date.

At the beginning of the video, Detective Hubbard asks Hurst, "Who are you getting your dope from?"  *See* Video dated Feb. 27, 2018 at 15:50:48.[3]   Hurst was reluctant to answer the question, so Detective Hubbard told her that it was her choice and that she could "eat her [drug] charges" if she wanted. *Id.*  Hurst then responds that her "dope" comes from someone named Cody Mobley but that Mobley had instructed her to go through Jacques for the last couple of weeks. *Id.*  Hurst usually goes to Jacques' house to make the purchase, and the house is located in Forest Hills next door to Mobley. *Id.*  She said she normally buys a "half ounce" at a time, and her most recent purchase was two nights earlier. [4] *Id.*  She also explained that it was about time for her to purchase again and that Jacques was "probably waiting on [her] now." *Id.*  She stated that she usually pays him $300.00, that she was short on money the last time she purchased from him, and that he has been adding $50.00 to each purchase to make up for the money she owes. *Id.*

Approximately thirty minutes later, Detective Hubbard told Hurst to send Jacques a text message to see if "he's up and able to bring it to you."  *Id.* at 16:21:19.  He tells her to say that she will be at her house on Texas Court in the next hour. *Id.*  He further instructs her to tell Jacques that she will have some of his money and that she needs "to get a half." *Id.*  Hubbard watches over Hurst's shoulder as she types, and he continues to monitor each message that she types throughout the entire videotaped interview. *Id.*  When Jacques does

---

[3] The court will use the above-styled hour-minute-second format to designate the time on the video when relevant events occurred. The court is unaware if the time on the video is the correct time of day that the events occurred.
[4] A half is a typical quantity used for purchasing methamphetamine and other drugs. Doc. 37 at 59.

not immediately respond, Hurst asks if she should call him, but Hubbard says not to call him yet. *Id.*  Hubbard eventually takes the phone and leaves the room. *Id.*

Later, Hubbard comes back into the room and says Jacques responded by texting "did you find her" and that Jacques was asking whether Hurst had found any drugs. *Id.* at 18:00:30.  Hubbard tells Hurst to ask Jacques to bring it to her house. *Id.*  A few minutes later, Hurst calls Jacques and says that she needs to get up with him, is on Texas Court, and does not have a vehicle. *Id.*  Jacques then says to give him about thirty minutes. Hubbard tells two other officers who are in the room with him to "get people in place." *Id.*

Approximately twenty minutes later, Hubbard tells Hurst to text Jacques and ask whether he is sure that he is going to be on his way. *Id.* at 18:23:54.  He also said to tell Jacques that she has his money and that she already has "got some sold." *Id.*  He then tells Hurst to do whatever she has to do to "finalize the sale." *Id.*

A few minutes later Hurst and Hubbard discuss money again. *Id.* at 18:30:26.  Hurst confirms that she normally pays Jacques $300 for a "half." *Id.*  Because Hurst already owes Jacques money, Hubbard suggests telling Jacques that she "hit a casino" and has $450.00. *Id.*  They then discuss whether to call Jacques, but Hubbard tells her to text him and say that she "hit a little bit at the casino last night" and has $400.00. *Id.*

About fifteen minutes later, Hubbard walks back in the room and tells Hurst that Jacques has responded by saying that he is home with his little girl and for Hurst to have someone drive her to his house. *Id.* at 18:46:25.  Hubbard directs Hurst to tell Jacques that she is at her house alone, that it will be quick, and all he has to do is drop it off. *Id.*

Later, Hubbard tells Hurst to ask Jacques what time he thinks he will be at her house because she is not going to have a ride. *Id.* at 18:54:48.  After a couple of minutes, Hurst calls Jacques to ask when he will be leaving. *Id.*  At the end of the phone conversation, Jacques asks about his money and Hurst replies that she has all of it. *Id.*

Hubbard then instructs Hurst to "tell him to make sure you bring what you need." *Id.* at 18:59:10.  Thirty minutes later, Hubbard instructs her to ask Jacques if he has left yet. *Id.* at 19:30:40.  Hurst calls but Jacques does not answer. *Id.*  Jacques then calls Hurst, says he is on Atlanta Highway, and confirms that she is on Texas Court. Ten minutes later at 19:40:41.  Shortly thereafter, Hurst leaves the interview room and the video ends. *Id.*

As the deal between Hurst and Jacques was being set up, Hubbard relayed information to the officers doing surveillance. Doc. 37 at 28.  In total, there were four detectives and five or six SWAT operators, not including supervisors, on the streets for the surveillance and the arrest. *Id.* at 29.  Because the purpose of the operation was a "takedown" after a controlled delivery,[5] the police had no intentions of pulling Jacques over for a traffic stop after he left his residence. *Id.* at 30.  The plan was to wait for Jacques to deliver the narcotics to 1806 Texas Court and then take him into custody. *Id.* at 37.

Officer R.T. Jackson is one of the officers who surveilled Jacques' residence while the police were waiting for him to leave. *Id.* at 63.   When Officer Jackson began the surveillance, he already knew that Jacques would be driving a white Nissan Titan truck. *Id.*

---

[5] Detective Hubbard testified that a "controlled delivery" occurs when the suspect arrives at the residence to deliver the drugs even if the CI is not present and there is no actual purchase. Doc. 37 at 46.  Out of concerns for Hurst's safety, Detective Hubbard did not want Hurst at her residence for a controlled buy when Jacques arrives. *Id.* at 48–49.

at 63–64.  Officer Jackson parked approximately fifty yards from Jacques' house and identified a vehicle matching that description at Jacques' residence. *Id.* at 64.  While there, Jackson was in contact with the other officers involved in the investigation. *Id.*  When Jacques left the residence, Jackson maintained visual on him as he traveled to Hurst's home. *Id.* at 64–65.  Jacques lived three to four miles from Hurst and took a direct route to Hurst's home. *Id.* at 65.  Officer Jackson followed Jacques until he turned onto Texas Court. *Id.* at 64–65.  While following, he maintained contact with the other officers and relayed information to them. *Id.* at 66.  He verified the vehicle description, advised that Jacques was speeding and driving erratically, and let them know the direction of travel. *Id.* Additional officers were located on Texas Court. *Id.* at 66–67.

SWAT Operator Lee Alley was on standby a block or two away from the residence on Texas Court until Jacques' vehicle approached. *Id.* at 68–70.  He had been given a vehicle description and a description of the suspect, and he observed the vehicle and suspect arrived on Texas Court at the same residence where he had conducted a search warrant earlier. *Id.* at 69.  All of the information he received while on standby came from Detective Hubbard. *Id.* at 74.  He and another officer waited approximately two or three hours before receiving information that the suspect was en route. *Id.* at 70.  When Jacques' vehicle pulled into Hurst's driveway on Texas Court, Alley and his partner pulled in behind him with the blue lights and sirens, and Alley's partner approached the driver's side of the vehicle. *Id.* at 71.  They asked to see Jacques' hands. *Id.* at 72.  Jacques complied and was handcuffed. *Id*.  He was placed in the back of the patrol car and transported back to the

Specials Ops Division. *Id.* This took approximately three to five minutes, and neither Alley nor his partner searched the vehicle. *Id.* at 73.

Corporal Todd Oliver was part of the SWAT team involved in the takedown. *Id.* at 77. He was parked several blocks away on the west side of Texas Court waiting for an undercover officer to advise that Jacques had arrived. *Id.* at 77–78. By the time Corporal Oliver arrived at the residence on Texas Court, officers from another vehicle had already made contact with Jacques and taken him into custody. *Id.* at 78–79. Corporal Oliver conducted a wingspan search of the driver's side of the vehicle to look for needles.[6] *Id.* at 79. Corporal Oliver located a black handgun but did not touch it. *Id.* at 79, 81. The police were not aware of any criminal history for Jacques and did not know if he had a permit to carry a pistol. *Id.* at 32–33. After conducting the wingspan search, Corporal Oliver drove the vehicle to the office and turned it over to an investigator. *Id.* 81.

Detective Hubbard testified that, when someone is arrested, vehicles are searched so valuables can be removed and then impounded. *Id.* at 49–50. When Jacques' truck was searched, the police located 66 grams of methamphetamine in a cowboy boot that was "behind the passenger seat, right underneath the child's car seat, up underneath the – where their feet would sit." *Id.* at 14.

When Detective Hubbard prepared the police report for this case, he wrote in the report that methamphetamine was discovered during the wingspan search. *Id.* at 31. While testifying, Detective Hubbard said more than once that the drugs were not found until the

---

[6] Detective Hubbard testified that, when methamphetamine is involved, the officers check for uncapped needles in or near the driver's seat. *Id.* at 40.

vehicle was taken back to the office and searched. *Id.* at 31.  He admitted that the statement in the police report about the drugs being found during the wingspan search is incorrect. *Id.* at 32.  Thus, there is no dispute that the methamphetamine was found after the vehicle was searched at the police department and not as part of the wingspan search conducted at the scene.

## II.    DEFENDANT'S ARGUMENTS

Defendant makes several arguments in his motion.  First, he argues that, because the police report states that certain traffic violations were committed but no citations were issued, there can be no reasonable suspicion. Doc. 18 at 1-2.  Next, he argues that the stop of Defendant was unlawful under *Rodriguez v. U.S.*, 135 S. Ct. (2015) because the stop was prolonged beyond the reasonable time to complete the issuance of a ticket. *Id.* at 2.  He also argues that the officers conducted a wingspan search after Jacques was taken into custody and after the police took his vehicle to the police department, but it was unnecessary because Jacques was cuffed immediately and was placed away from his vehicle. *Id.* at 2-3.  Finally, Jacques argues that the police detained him longer than necessary to investigate the matter under *Terry v. Ohio*, 392 U.S. 1 (1968). *Id.* at 3-4.

At the suppression hearing, Defendant's attorney argued that the evidence should be suppressed because the videotaped interview establishes that Jacques never actually agreed to deliver or sale "methamphetamine" or any type of drugs to Hurst and, instead, agreed only to go to Hurst's home to pick up money she owed to him. *Id.* at 85–88. Jacques' attorney further argued that nothing occurred between the arrest and the vehicle search that "changed the status of my client.  It was an arrest, and they didn't have probable

cause from that.  They didn't develop probable cause from it.  They didn't independently verify any information." *Id.* at 86.

## III.   THE GOVERNMENT'S RESPONSE

In response, the Government argues that, with respect to the stop of Defendant, information obtained by the police from the confidential informant provided the police with a reasonable suspicion that the person was involved in criminal activity and, therefore, police could stop the car and briefly detain it and its occupants in order to investigate that suspicion. Doc. 35 at 3.  Regarding the search of Defendant's vehicle, the Government cites *California v. Carney*, 471 U.S. 386, 390 (1985) and argues that the vehicle search was lawful under the automobile exception to warrantless searches, as the vehicle was readily movable and probable cause existed to believe it contained contraband. Doc. 35 at 4.

## IV.   APPLICABLE LAW

The Fourth Amendment to the United States Constitution guarantees the right of individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizure." U.S. Const. amend. IV.  In general, a seizure of the person, as applicable to Fourth Amendment protections, occurs when police conduct would communicate to a reasonable person, taking into account the circumstances surrounding the encounter, that the person is not free to ignore the police presence and leave at his will. *United States v. Mendenhall*, 466 U.S. 544, 554 (1980).  In general, a search, as applicable to Fourth Amendment protections, occurs when a governmental employee or agent violates a person's reasonable expectation of privacy. *United States v. Jacobsen*, 466 U.S. 109, 114 (1984 ("A search occurs when an expectation of privacy that society is prepared to

consider reasonable is infringed.").  A seizure of property discovered as a result of such a search occurs when there is some meaningful interference with a person's possessory interests in that property. *Id.*

### A.    Fourth Amendment Protections Against Seizures

Generally, the Fourth Amendment protects against unreasonable seizures. U.S. Const. amend. IV.  In determining whether a seizure is reasonable, the type of encounter between police and the citizen determines the amount of Fourth Amendment scrutiny to be applied. *United States v. Perkins*, 348 F.3d 965, 969 (11th Cir. 2003).  The Supreme Court has identified at least three levels of scrutiny to be applied to police-citizen encounters:

> (1) brief, consensual and non-coercive interactions that do not require Fourth Amendment scrutiny, *Florida v. Bostick*, 501 U.S. 429 (1991); (2) legitimate and restrained investigative stops short of arrests to which limited Fourth Amendment scrutiny is applied, *Terry v. Ohio*, 392 U.S. 1 (1968); and (3) technical arrests, full-blown . . . custodial detentions that lead to a stricter form of Fourth Amendment scrutiny, *Brown v. Illinois*, 422 U.S. 590 (1975).

*Perkins*, 348 F.3d at 969.

Brief, consensual, and non-coercive interactions between police and citizens, the first category addressed above, do not require any particular level of suspicion on the part of the officer and are not viewed as seizures under the Fourth Amendment. *United States v. Griffin*, 696 F.3d 1354, 1360 (11th Cir. 2012) (quoting *Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("The Supreme Court has 'held repeatedly that mere police questioning does not constitute a seizure.'")).

The second category, investigative stops short of arrests—including traffic stops—are governed by *Terry v. Ohio* and are subjected to limited Fourth Amendment scrutiny

requiring only a reasonable suspicion of criminal wrongdoing. 392 U.S. 1, 30 (1968). While such stops are "seizure[s] within the meaning of the Fourth Amendment," *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001), they are "constitutional if [they are] *either* based upon probable cause to believe a traffic violation has occurred *or* justified by reasonable suspicion as set forth in *Terry*." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam) (citing *United States v. Chanthasouxat,* 342 F.3d 1271, 1275 (11th Cir. 2003)) (emphasis added).

The third category, technical arrests or custodial detentions, require an arrest warrant or that an officer have probable cause to believe that a crime has occurred. *United States v. Watson*, 423 U.S. 411, 415 (1976). "Probable cause to arrest exists when the totality of the facts and circumstances support a reasonable belief that the suspect had committed or was committing a crime." *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) (internal quotation omitted).    Probable cause does not require overwhelmingly convincing evidence but only "reasonably trustworthy information." *Marx v. Grumbinner*, 905 F.2d 1503, 1506 (11th Cir. 1990) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

## B.    Fourth Amendment Protections Against Searches

The Fourth Amendment also protects against searches that are unreasonable. U.S. Const. amend. IV.   Ordinarily, a warrant based upon probable cause must issue prior to a search taking place; however, there is an exception for automobiles. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999).   Under the automobile exception, an officer is permitted to conduct a warrantless search of a vehicle when: "(1) there is probable cause to believe the

11

vehicle contains contraband or other evidence which is subject to seizure under the law, and (2) exigent circumstances necessitate a search or seizure." *United States v. Talley*, 108 F.3d 277, 281 (11th Cir. 1997).   Probable cause exists when there is "a fair probability that contraband or evidence of a crime will be found." *Sokolow*, 490 U.S. at 7.   "While probable cause requires only a probability or substantial chance of criminal activity, mere suspicion is not enough." *United States v. Allison*, 953 F.2d 1346, 1350 (11th Cir. 1992).   A separate showing of exigency is not required when a vehicle is readily movable. *Dyson*, 527 U.S. at 467.

### C.   Establishing Probable Cause

As set forth above, probable cause is required for an arrest and for a warrantless search of a vehicle under the automobile exception.   Probable cause may be established through the use of a CI.   In determining whether the information provided by a CI rises to the level of probable cause, courts look at the totality of the circumstances. *United States v. Campbell*, 920 F.2d 793, 796 (11th Cir. 1991) (citing *Illinois v. Gates,* 462 U.S. 213, 230 (1983).   "We consider the relevance of factors such as the [CI's] veracity, reliability, and bases of knowledge." *U.S. v. Gonzalez,* 969 F.2d 999, 1003 (11th Cir. 1992) (citing *Gates,* 462 U.S. at 230).

Factors to consider are: (1) whether the information provided, if untrue, places the CI at risk for negative repercussions because the CI is not anonymous, *Breeding ex rel. C.B. v. Driscoll,* 82 F.3d 383, 388 (11th Cir. 1996); (2) whether the information provided is specific information typically known only by someone with personal knowledge, *United States v. Kent,* 691 F.2d 1376, 1381 (11th Cir. 1982); (3) whether the information is capable

of objective verification, *id.;* (4) whether the information provides details about "future actions of third parties ordinarily not easily predicted" that later occur, *Gates,* 462 U.S. at 245; (5) whether there is a past history between the informant and the police department that supports reliability, *id.;* and (6) whether the information was stale at the time it was received by officers, *United States v. Harris,* 20 F.3d 445, 450 (11th Cir. 1994).

### D.     Searches Incident to a Lawful Arrest

In addition to the automobile exception, another exception to a warrantless search of a vehicle is a search incident to an arrest.  "[C]ircumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Arizona v. Gant*, 556 U.S. 332, 343–44 (2009) (holding police may search vehicle incident to recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest).  In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. *Id.* at 344 (citations omitted).  However, in other situations, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein. *Id.*

## V.     DISCUSSION

In his motion, Defendant relies in part on *Terry, supra,* where the Supreme Court adopted "a dual inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe,* 470 U.S. 675, 682 (1985) (citing *Terry,* 392 U.S. at 20); *see also United*

*States v. Powell,* 222 F.3d 913, 917 (11th Cir. 2000).  He argues that the actions of the police exceed the bounds of *Terry*; however, there was no investigative stop in this case. The intention of the police from the beginning was to arrest Jacques as soon as he arrived at Hurst's home, and both parties admit that he was arrested immediately at the scene. Accordingly, the undersigned will not address Defendant's arguments under *Terry*. Instead, the undersigned must determine whether the police had probable cause to arrest Jacques and subsequently search his vehicle.  Applying the case law cited above, the undersigned concludes that Defendant's Fourth Amendment rights were not violated and that his Motion to Suppress is due to be denied.

## A.   Probable Cause Existed to Arrest Jacques

Under the totality of the circumstances, the undersigned concludes that probable cause existed to arrest Defendant based on information provided by the CI.  Indeed, five of the six non-exclusive factors listed above for determining whether information from a CI rises to the level of probable cause are satisfied in this case. The court will examine each factor below.

### Factor 1: Whether the tip places the informant at risk for negative repercussions if untrue because the CI is not anonymous.

Here, the CI was not anonymous but was instead an individual who had been arrested earlier in the day on possession and drug trafficking charges.  A review of the video in this case indicates that the CI was given an opportunity to gain some degree of leniency for her cases.  As such, the CI could easily be tracked down if the information she provided was untrue, and, because she was trying to work off her own cases, she was at

risk for negative repercussions if she provided untrue information.  Further, the CI was subject to exposure because she had direct contact with Jacques.  She was not anonymous to the officers or to Jacques.  Thus, the court concludes that the CI's exposure and lack of anonymity supports the CI's inclination for truthfulness and favors the establishment of probable cause.

### Factor 2: Whether the CI's information provides specific information typically known only by someone with personal knowledge.

Here, the CI engaged Jacques in telephone conversations that were listened to and text conversations that were observed by Detective Hubbard.  The fact that she communicated by text message indicates that she knew Jacques' cell phone number. Shortly after the interview with Hurst began, Detective Hubbard knew that Jacques was at his residence in the Forest Hills subdivision.   Detective Hubbard and the other officers then knew when Jacques was about to leave his residence and go to Hurst's residence on Texas Court.  Jacques called Hurst and stated that he was on Atlanta Highway heading toward Texas Court, which officers were able to confirm as they followed him.  Without Hurst's personal knowledge, gained through telephone conversations and text messages with Jacques while in custody, the police would have been unable to confirm that Jacques was inside his residence and would not have known when, if at all, Jacques would be leaving or that he would be driving to Hurst's residence. This supports the veracity and reliability of the CI's information and favors the establishment of probable cause.

**Factor 3: Whether the information is capable of objective verification.**

The information Detective Hubbard gained through discussions with Hurst and her communications with Jacques was capable of objective verification.  In fact, Detective Hubbard did verify that Jacques owned a white Nissan Titan truck, that it was parked at a residence in Forest Hills where Hurst said Jacques resided, that Jacques left his residence heading toward Texas Court, and that he arrived at Hurst's home on Texas Court shortly after he called and said he was on his way.  The undersigned concludes that this supports the reliability of the information provided by the CI and favors the establishment of probable cause.

**Factor 4: Whether the information provides details about "future actions of third parties ordinarily not easily predicted" that later occur.**

At the beginning of the police interview, Hurst provided law enforcement with identifying information about Jacques.  Then, by listening to Hurst's telephone conversations with Jacques and directing and monitoring the text messages between Jacques and Hurst, the officers knew when Jacques was going to leave his house and knew that he would be going to Hurst's residence.  Without the identifying information provided by Hurst and the communications between Hurst and Jacques, the police could never have predicted that Jacques would leave his home at a certain time and drive directly to the CI's home.  This supports the reliability of the information and favors the establishment of probable cause.

**Factor 5: Whether there is a past history between the informant and the police department that supports reliability.**

There was no past history between the CI and Detective Hubbard in this case. The video reveals the possibility that Hurst may have previously been given the opportunity to work off a case and that she did not participate, but the parties presented no evidence about such an arrangement. The fact that Detective Hubbard had not previously dealt with this particular CI and did not have knowledge about her reliability does not favor the establishment of probable cause.

**Factor 6: Whether the information was stale when it was received by officers.**

Stale information does not bode well for the establishment of probable cause. *See Harris*, 20 F.3d at 451 (noting that "[w]arrant applications based upon stale information fail to create a probable cause that similar or other improper conduct is continuing."). In this case, however, Detective Hubbard received real-time information from Hurst over a three-hour period. Hurst identified Jacques as one of her drug suppliers, stating that her most recent purchase occurred two nights earlier. She stated that she normally purchases a "half" from him, and she requested a "half" in a text message to him. They then communicated back and forth for a few hours with Hurst telling him that she had some money that she owed him, that she needed him to come to her house, that she needed him to bring what he needed, and that she had already sold some. Therefore, although the defense has argued that Jacques never specifically stated that he would be delivering methamphetamine or drugs to Hurst, there is little doubt, based on the conversations between Hurst and Jacques, that criminal activity was ongoing. The fact that the CI's

information was current and occurring in real-time favors the reliability of the information and the establishment of probable cause.

**Totality of the Circumstances**

Under the totality of the circumstances, the undersigned concludes that the information provided by the CI established probable cause to arrest Jacques. Based on information Hurst provided to Detective Hubbard, he was able to verify Jacques' address and vehicle. Detective Hubbard instructed Hurst to request her normal quantity of "dope" from Jacques, which was half of an ounce. Hurst, who knew Jacques' cell phone number, communicated to him that she wanted to buy a "half," told him that she already had some of it sold, told him that she had some of the money she owed him, and told him to make sure he brought what he needed. Jacques communicated back and forth with Hurst with no questions about what she meant by purchasing a "half" or her request to bring what he needed.

The police surveilled Defendant's home, and they knew when he was about to leave his home to drive to Hurst's home. The police were able to follow Jacques on his direct route to Hurst's home and observe him as he pulled into Hurst's driveway. Being able to independently verify the information revealed through Hurst's telephone calls and text messages with Jacques bolstered her credibility. Further, Hurst would have suffered negative consequences with respect to her own criminal charges if she had not been truthful, and the fact that she was not anonymous to law enforcement or Jacques supports that she was being truthful. Detective Hubbard had never worked with Hurst, but that is not detrimental under a totality-of-the-circumstances analysis. Considering all of the

circumstances, the undersigned concludes that the CI's information in this case provided law enforcement with the probable cause needed to arrest Jacques.  As such, no Fourth Amendment violation occurred when Jacques was arrested.

**B.      The Automobile Exception**

As explained above, an officer is permitted to conduct a warrantless vehicle search when "(1) there is probable cause to believe the vehicle contains contraband or other evidence which is subject to seizure under the law, and (2) exigent circumstances necessitate a search or seizure." *Talley*, 108 F.3d at 281. Because a separate showing of exigency is not required when the vehicle is readily movable, *Dyson*, 527 U.S. 467, the only question for the undersigned to determine is whether there was probable cause to search the truck.  For the same reasons that probable cause existed to arrest Jacques, probable causes existed to conduct a warrantless search of Jacques' truck.  Thus, the search of Jacques' vehicle falls under the automobile exception, and no Fourth Amendment violation occurred when law enforcement searched his vehicle.

**C.      Search Incident to Arrest**

Finally, the police were justified in searching the vehicle incident to Jacques' lawful arrest.  As set forth above, circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. 332, 343–44.  In this case, the police were informed by Hurst that her supplier of "dope" was Jacques, and they heard and observed communications between Hurst and Jacques establishing that Hurst requested "a half" from him and that he would be delivering it to her house.  The fact that

Jacques was delivering drugs to Hurst, under the circumstances described above, makes it reasonable to believe that drugs were located in his truck.  Thus, for the same reasons that probable cause was established in this case, it was reasonable for the police to believe Jacques' vehicle contained evidence of the offense for which he was being arrested. Accordingly, the search of the vehicle was a search incident to a lawful arrest, and no Fourth Amendment violation occurred.

VI.   **CONCLUSION**

Because the search of Defendant's truck was based on a legal arrest supported by probable cause, as articulated above, the undersigned concludes that the search of his vehicle was within the bounds of both the "automobile exception" and a "search incident to an arrest."  Accordingly, the undersigned RECOMMENDS that Defendant's Motion to Suppress (Doc. 18) be DENIED.

It is further ORDERED that the parties are DIRECTED to file any objections to the said Recommendation **on or before May 29, 2019**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable. Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Nettles v. Wainwright*,

677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982);

s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting

as binding precedent all of the decisions of the former Fifth Circuit handed down prior to

the close of business on September 30, 1981).

      DONE this 15th day of May, 2019.

              /s/ Wallace Capel, Jr.
              WALLACE CAPEL, JR.
              CHIEF UNITED STATES MAGISTRATE JUDGE